Brett N. Taylor (SBN 274400)
btaylor@cozen.com
Matthew E. Lewitz (SBN 325379)
mlewitz@cozen.com
Madeline J. Suchard (SBN 328662)
msuchard@cozen.com
COZEN O'CONNOR
401 Wilshire Boulevard, Suite 850
Santa Monica, CA 90401
Telephone: 310.393.4000
Facsimile: 310.394.4700

Attorneys for Defendant NextRoll, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIDAN AARONS and SEAN POLLARD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NEXTROLL, INC., a Delaware corporation,<br><br>Defendant. | Case No.<br><br>[San Francisco Superior Court Case No. CGC-26-637769]<br><br>**DECLARATION OF MATTHEW E. LEWITZ IN SUPPORT OF DEFENDANT NEXTROLL, INC.'S NOTICE OF REMOVAL**<br><br>[28 U.S.C. § 1331, 1367, , 1441, AND 1446]<br><br>[Notice of Removal Served and Filed Concurrently Herewith] |

## DECLARATION OF MATTHEW E. LEWITZ

I, Matthew E. Lewitz, declare as follows:

1. I am an attorney duly licensed to practice in the State of California and in the United States District Court for the Northern District of California. I am a member of Cozen O'Connor, attorneys of record for Defendant NextRoll, Inc. ("Defendant" or "NextRoll").

2. I have personal knowledge of the matters stated below or base my knowledge on my review of the case file. As to those matters stated on information and belief, I believe them to be true. If called as a witness, I could and would testify competently thereto.

3. Attached as **Exhibit A** is a true and correct copy of the Complaint filed by Plaintiffs Aidan Aarons and Sean Pollard, individually and on behalf of all others similarly situated ("Plaintiffs"), in the Superior Court of the State of California, County of San Francisco, Case Number CGC-26-637769 (the "State Court Action").

4. On July 20, 2026, Plaintiff served NextRoll with a copy of the Summons and Complaint in the State Court Action.

5. Attached as **Exhibit B** is a true and correct copy of all process, pleadings, and orders in the State Court Action (other than the Complaint) and copy of the State Court Action docket.

6. Attached as **Exhibit C** is a true and correct copy of the notice of removal served on all parties and to be filed in the State Court Action (without exhibits).

I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct.

Executed on August 19, 2026 at Santa Monica, California.

[signature]

Matthew E. Lewitz

# EXHIBIT A

Matthew W. Ruan (SBN 264409)
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@jjlmlaw.com

Nicholas R. Lange (*pro hac vice* forthcoming)
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
nlange@jjlmlaw.com

*Counsel for Plaintiffs and the Proposed Class*

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**06/10/2026**
**Clerk of the Court**
BY: ERNALYN BURA
Deputy Clerk

**UNITED STATES DISTRICT COURT**
**FOR THE COUNTY OF SAN FRANCISCO**

AIDAN AARONS and SEAN POLLARD, individually and on behalf of all others similarly situated,

*Plaintiffs,*

v.

NEXTROLL, INC., a Delaware corporation,

*Defendant.*

Case No.: **CGC-26-637769**

**CLASS ACTION COMPLAINT FOR:**

**Violation of Cal. Penal Code § 631**
**Violation of Cal. Penal Code § 638.51**
**Violation of Cal. Penal Code § 632**
**Violation of Cal. Penal Code § 502**
**Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq*.**
**Violation of the California Constitution Art. 1, § 1**
**Violation of Cal. Bus. & Prof. Code § 17200, *et seq*.**
**Common Law Invasion of Privacy – Intrusion Upon Seclusion**

**DEMAND FOR JURY TRIAL**

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Aidan Aarons and Sean Pollard (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint and Demand for Jury Trial against Defendant NextRoll, Inc. ("Defendant" or "NextRoll") for surreptitiously collecting consumers' web browsing activities. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief.

## NATURE OF THE ACTION

1. This lawsuit challenges NextRoll's vast data surveillance of California residents' internet activities without their knowledge or consent, including the surveillance of sensitive health communications.

2. NextRoll is an advertising, analytics, and data broker company that secretly tracks consumers across the internet through invisible tracking code (the "Tracking Technologies"). These Tracking Technologies are clandestinely embedded on thousands of websites. They assign unique identifiers to website users and intercept users' communications made on various websites in real-time, including their browser and device information, geolocation information, and user activity, including pages visited, search terms, products viewed, purchased, or added to shopping carts, and interactions with sensitive health content.

3. Through the operation of its flagship advertising product, AdRoll, NextRoll deploys the Tracking Technologies to collect users' IP addresses, including geolocation data, device information, browsing data, and persistent cookie identifiers, including the "_adroll", "_ar_v4", and "_adroll_fpc" cookies that follow users across different websites and browsing sessions. This enables NextRoll to build detailed digital dossiers on millions of consumers, tracking what articles they read, what products they view, and even what sensitive medical conditions they research.

4. NextRoll's surreptitious interception of users' communications violates California's wiretapping laws. Its systematic collection of IP addresses and routing information without a court

order also violates California's pen register statute. And its unauthorized access to users' devices to extract personal data violates multiple other privacy protections under California law.

5. NextRoll's own privacy policy acknowledges collection of IP addresses, cookie identifiers, device identifiers, geolocation data, and browsing history, information that is personally identifiable and sensitive.

6. Plaintiffs bring this action on behalf of millions of Californians whose privacy has been invaded by NextRoll's unlawful tracking. Through this action, Plaintiffs seek damages, restitution, and injunctive relief to stop these violations.

## PARTIES

7. Plaintiff Aidan Aarons is an individual and citizen of the State of California, residing in Twentynine Palms, California.

8. Plaintiff Sean Pollard is an individual and citizen of the State of California, residing in Beaumont, California.

9. Defendant NextRoll, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in San Francisco, California. NextRoll is a privately-owned company generating more than $150 million in annual revenue.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over this action under Article VI, Section 10, of the California Constitution; CIPA, Cal. Penal Code § 638.51 and Cal. Code Civ. Proc § 410.10. This action is brought as a class action on behalf of Plaintiffs and Class Members under Cal. Code Civ. Proc. § 382.

11. This Court has personal jurisdiction over the parties because Defendant is headquartered and has a principal place of business in San Francisco County and has systematically conducted business in San Francisco County.

12. Venue is proper in this Court because Defendant resides in San Francisco County.

## COMMON FACTUAL ALLEGATIONS

13. NextRoll is a technology firm and registered data broker. It operates entirely "behind the scenes" of various websites. It has no visible user interface and provides no direct services to users, nor any opportunity for users to review or consent to NextRoll's privacy practices.

14. NextRoll is in the "programmatic advertising" business, i.e., the automated process of buying and selling ad space online. NextRoll's business is to help its clients place targeted ads in front of consumers by participating in high-speed, background auctions for ad space on websites and mobile apps, as well as connected TV, audio platforms and in-game environments. NextRoll generates approximately $150 million in annual revenue and processes billions of advertising requests daily.

15. To carry out its business, NextRoll must gather as much information as possible about internet users. To do so, it has developed a business model centered on the surreptitious surveillance and collection of consumer data through two primary channels. First, it provides its Tracking Technologies that its clients embed on their websites to monitor visitor behavior in real time. Second, it participates in automated advertising auctions known as "real-time bidding," in which it collects data about internet users across thousands of websites. Through both mechanisms, NextRoll intercepts and gathers sensitive personal information without users' knowledge or consent, creating detailed profiles that it uses for its own commercial purposes without users' knowledge or consent.

### A. NextRoll's Collection of User Data Through its Tracking Technologies

16. NextRoll provides its advertising clients with tracking technology known as the Tracking Techonologies. These technologies, when embedded on websites, secretly collect extensive information about visitors and transmit it directly to NextRoll's servers.

17. The Tracking Technologies include tracking pixels, including the AdRoll Pixel. Despite its name, a pixel in this context is not actually a visible image but rather a small piece of invisible JavaScript code that website owners embed on their webpages. A pixel executes when a

webpage loads: when a user's browser loads a page containing a tracking pixel, the browser is forced to communicate with the server that hosts the pixel. In the case of websites containing the AdRoll pixel, the user's browser will communicate with the domain "ad.ipredictive.com"—the domain that connects to NextRoll's server. This communication occurs automatically without any action by the user.

18. During this forced communication, the advertising pixel causes the user's browser to transmit information about the user and their browsing activity directly to NextRoll. This includes both information that the browser automatically sends with any web request and additional data that the pixel's JavaScript code extracts from the user's device and browsing session.

19. Website owners install and configure NextRoll's advertising pixels to measure and optimize their advertising campaigns. The pixel serves two primary commercial functions that make it valuable to website owners that wish to advertise their products or services on the internet.

20. First, NextRoll's pixels, such as the AdRoll Pixel, enable "conversion tracking," which involves measuring whether users who saw or clicked on an advertisement later completed a desired action on the website on which the advteriser's advertismenet appears. For example, if a medical device company advertises on news websites through NextRoll, the pixel on the company's own website can identify when someone who previously saw their ad later visits their site to make a purchase or request information. This allows advertisers to calculate their return on advertising investment and identify which ad placements drive the most valuable customer actions.

21. Second, NextRoll's pixels, such as the AdRoll Pixel, enable "retargeting" or "remarketing," the practice of showing ads to users based on their previous website visits. When a user visits a website with the pixel but does not make a purchase or complete an action desired by the website owner, the pixel marks that user for retargeting, enabling the advertiser to show them ads as they browse other websites across the internet. This is why users often see advertisements "following" them after visiting a particular website: a tracking pixel such as NextRoll's has identified them as a target for continued advertising pursuit.

22. To track users over time and across different websites for conversion or retargeting purposes, these pixels utilize various cookies. A cookie is a small text file that a web server instructs a browser to store on the user's device. Once stored, the cookie is automatically included in future communications with that server, allowing the server to recognize returning visitors.

23. NextRoll's AdRoll pixel, for example, sets persistent cookie identifiers, called "_adroll", "_ar_v4", and "_adroll_fpc" (hereinafter collectively referred to as the "Unique Identifiers") on users' devices. The Unique Identifiers function as a unique and lasting digital identifier, similar to a permanent name tag, that follows the user's browser across different websites and browsing sessions, enabling NextRoll to build comprehensive profiles of users' long-term browsing habits. These cookies persist for up to 13 months and are refreshed each time a user visits any website running NextRoll's pixel—effectively creating an indefinite tracking mechanism for regular internet users.

24. Additionally, cookies may be set two ways—as first or third party cookies. Third-party cookies, such as those placed by a third party on a website, may be occassionally blocked by certain internet browsers. First-party pixels like those placed by a website owner directly onto its website, face far fewer restrictions. NextRoll employs several of its cookies, such as the _ar_v4 and _adroll_fpc cookies, in the first-party context on customer or advertiser domains as part of the advertiser's integration of NextRoll's tracking infrastructure, including through advertiser-side or first-party deployment workflows. These identifiers support cross-channel measurement, attribution, and identity resolution, including linking web activity to other advertising environments such as Connected TV ("CTV"), email, and other addressable channels. NextRoll intentionally deploys these cookies in the first-party context to obscure its involvement and make the tracking less visible to users, and less likely to be blocked by privacy-conscious browsers.

25. When a user visits any website containing NextRoll advertising pixels, the pixel reads the cookie and transmits it to NextRoll along with information about the user's current activity. This allows NextRoll to connect the user's activity across different websites and over time, building

an increasingly detailed profile of their interests, behaviors, and characteristics.

26. All of these transmissions to NextRoll occur in real time, contemporaneously with users' interactions with websites that Tracking Technologies are installed onto; i.e., as the webpages load and as users browse webpages, including communicating search terms, viewing pages, and placing products in shopping carts and purchasing them. The Tracking Technologies trigger and send these communications to NextRoll while users' communications with the underlying websites are in transit, not after-the-fact.

*1. Specific Data Collected Through the AdRoll Pixel*

27. When the AdRoll Pixel executes on a webpage, it collects and transmits extensive data about users including: the Unique Identifiers and mobile advertising identifiers (e.g., Apple IDFA aned Android Advertising ID), and other device or browser-based identifiers); hashed email addresses, which are actively used for cross-device matching, audience syncing, and advertising; browser and device information, including operating system, device type, browser type and version and other technical attributes; geolocation information, such as country, state, city, and ZIP or postal code, derived from IP addresses, and in certain contexts, precise geolocation data; and extensive user activity data across websites it is implemented on, such as the complete URL of the page being visited; search terms, referring page information showing how the user arrived; timestamps of all activity; pages visited, time spent on pages, products viewed or purchased, items added to shopping carts, white papers downloaded, ads viewed or clicked, conversions, and other indicators of online behavior.

28. Along with the above-referenced user data, the AdRoll pixel collects users' IP addresses. The IP addresses collected are globally unique numerical identifiers that guide or route communications across the internet. Often written as four sets of numbers separated by periods (e.g., 192.555.455.145), internet service providers assign IP addresses to networking devices such as modems or routers (including household modems and routers). IP addresses function as the essential addressing system of the internet. Just as a telephone number is a unique number necessary to route

a phone call to the correct household, an IP address is a unique number necessary for routing internet communications to the correct location. And just as a phone number can reveal the general location of the caller, an IP address reveals the general geographic location of the internet user, often down to the city level, and sometimes to the level of specific zip codes.

29. The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking purposes. IP addresses can allow companies to target advertisements to users in specific geographic areas with over 95% accuracy. For example, businesses who are trying to reach specific demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide wireless internet networks or associated with particular events, such as job fairs or festivals. By using IP addresses to target specific households, businesses, or events based on their location, advertisers can avoid wasting money on ads unlikely to be seen by their target audience.

30. IP addresses are not openly accessible or discoverable at large. If a user is not actively transmitting data packets, their IP address remains private and is not exposed to the broader internet or third parties. However, the broader term "IP address" used in this complaint should be distinguished from the term "private IP address," which refers to a different, specific type of IP address used within internal networks, which is not routable on the public internet and does not reveal anything about a user's geolocation. Private IP addresses are not relevant to or otherwise addressed in this complaint.

31. An IP address is "routing, addressing, or signaling information." It is "routing" or "signaling" information because it sends or directs the user's communication from the router in their home or workplace to the website they are communicating with, ensuring that the web content being accessed (whether that be websites, streaming content, emails, or other data) reaches the user correctly. It is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

32. When combined with cookies, IP addresses can be powerful tools for identifying

specific individuals and tracking their browsing habits. A cookie assigns a stable identifier to a particular browser, while an IP address identifies the network connection used at that moment. When the same cookie identifier reappears from different IP addresses over the course of a day or week (for example, a residential IP in the morning and evening and an employer's IP during working hours), companies like Defendant can associate those networks, and the locations they imply, with the same browser. Over time, that pattern distinguishes that browser from others who share the same network and maps routine usage. Because cookies persist across IP changes (mobile data, travel, dynamic addressing), they bridge sessions and provide continuity, while IP information supplies location and network context. Used together, cookies and IP addresses enable highly granular tracking of a browser's activity across sites and over time.

33. The NextRoll's advertising pixels, such as its AdRoll Pixel, function as pen registers, systematically recording users' IP addresses and other data from thousands of websites as an undisclosed third party that the users have no knowledge of or relationship with.

34. This data collection begins the moment a page loads, before users have any opportunity to review privacy policies or consent to tracking. The transmission to NextRoll's servers occurs automatically in the background. It is invisible to users.

35. The NextRoll advertising pixels, including the AdRoll Pixel, intercept communications between users and website operators while these communications are in transit. As data travels between users' browsers and a website's servers, the pixels intercept and read these transmissions in real-time, capturing clicks, page visits, search terms, and form entries, together with users' IP addresses. NextRoll reads or attempts to read these communications by analyzing and interpreting the data streams mid-transmission, automatically identifying and classifying data types and values, extracting personal information, search queries, and behavioral data while the communications are still traveling to their intended destination.

*2. Examples of NextRoll's Pixels' Deployment on Sensitive Websites*

36. *Women's Health Network (womenshealthnetwork*.com): this women's health

education and wellness website focuses heavily on conditions commonly tied to hormonal and midlife health— such as menopause and perimenopause, thyroid issues, adrenal stress, bone health, weight changes, and fatigue. The site publishes a large library of health articles and guidance (including condition-specific explainers like menopause supplements and vitamins), offers Q&A-style support through its FAQs, and positions itself as a community-supported resource whose content is funded through the sale of its products rather than advertising. When users visit womenshealthnetwork.com, their device information and sensitive browsing activity is immediately transmitted to NextRoll, alongside the user's IP address and the user's Unique Identifiers. Such sensitive browsing activity includes the complete URL of the pages being visited, referring page information, timestamps of all activity, and page views, including full URLs, such as https://www.womenshealthnetwork.com/fertility/ or https://shop.womenshealthnetwork.com/products/arginelle, products viewed or purchased, items added to shopping carts, ads viewed or clicked, conversions, and other indicators of online behavior.

37. Importantly, the Tracking Technologies intercept this information, in real time, for *every* such interaction. This enables marketing conversion and retargeting trackers to operate on the site without the user's knowledge or consent. NextRoll then stores this data to enhance its internal user profiles for its own commercial benefit, allowing for more precise audience segmentation and improved bidding on behalf of its clients.

38. *BulkSupplements.com*: this online supplement retailer sells a large catalog of bulk powders and encapsulated supplements, spanning categories like vitamins, minerals, amino acids, herbal extracts, sweeteners, and protein powders. Its product library is extensive (the company advertises 600+ items) through an alphabetized catalog of ingredients and supplement products. From an operations and quality-positioning standpoint, BulkSupplements states it runs a cGMP manufacturing and distribution facility and that each supplement is tested by a third-party laboratory before distribution. When users visit BulkSupplements.com, their device information and sensitive browsing activity is immediately transmitted to NextRoll, alongside the user's IP address and the

user's Unique Identifiers. Such sensitive browsing activity includes the complete URL of the page being visited, referring page information, timestamps of all activity, and page views, including full URLs, such as https://www.bulksupplements.com/collections/weight-management-supplements or https://www.bulksupplements.com/products/niacin-vitamin-b3-pure-powder?_pos=1&_sid=e6fd3787a&_ss=r , products viewed or purchased, search terms entered, items added to shopping carts, ads viewed or clicked, conversions, and other indicators of online behavior.

39. Importantly, the Tracking Technologies intercept this information, in real time, for *every* such interaction. This enables marketing conversion and retargeting trackers to operate on the site without the user's knowledge or consent. NextRoll then stores this data to enhance its internal user profiles for its own commercial benefit, allowing for more precise audience segmentation and improved bidding on behalf of its clients.

40. *DrugBank (drugbank.com)*: this online drug intelligence database provides structured information on drugs and drug targets used by researchers and health professionals. In addition to drug records, DrugBank offers practical tools like a Drug Interaction Checker for cross-checking medications for potentially unsafe interactions. When users visit drugbank.com.com, their device information and sensitive browsing activity is immediately transmitted to NextRoll, alongside the user's IP address and the user's Unique Identifiers. Such sensitive browsing activity includes the complete URL of the page being visited, referring page information, timestamps of all activity, pro, and page views, including full URLs, such as https://go.drugbank.com/drugs or https://go.drugbank.com/drugs/DB11344, search terms entered, ads viewed or clicked, conversions, and other indicators of online behavior.

41. Importantly, the Tracking Technologies intercept this information, in real time, for *every* such interaction. This enables marketing conversion and retargeting trackers to operate on the site without the user's knowledge or consent. NextRoll then stores this data to enhance its internal user profiles for its own commercial benefit, allowing for more precise audience segmentation and

improved bidding on behalf of its clients.

42. *Front Office Sports (frontofficesports.com)*: this multi-platform media and news organization focuses on the business of sports, covering how sports intersects with business and culture. When users visit frontofficesports.com, their device information and sensitive browsing activity is immediately transmitted to NextRoll, alongside the user's IP address and the user's Unique Identifiers. Such sensitive browsing activity includes the complete URL of the page being visited, referring page information, timestamps of all activity, pro, and page views, including full URLs, such as https://frontofficesports.com/chiefs-cowboys-nfl-playoffs-ratings/ or https://frontofficesports.com/grand-slam-track-sydney-mclaughlin-citius-mag/, search terms entered, ads viewed or clicked, conversions, and other other indincators of online behavior.

43. Importantly, the Tracking Technologies intercept this information, in real time, for *every* such interaction. This enables marketing conversion and retargeting trackers to operate on the site without the user's knowledge or consent. NextRoll then stores this data to enhance its internal user profiles for its own commercial benefit, allowing for more precise audience segmentation and improved bidding on behalf of its clients

**B. NextRoll's Collection of User Data Through Real-Time Bidding**

44. In addition to direct tracking through its Tracking Technologies, NextRoll collects vast amounts of user data through its participation in the "real-time bidding" (or "RTB") advertising ecosystem. This system enables NextRoll to gather personal information from users across thousands of websites, regardless of whether the AdRoll Pixel has been installed on a website.

45. Real-time bidding is the automated auction system that determines which advertisements appear on digital spaces such as websites. When a user visits a webpage containing ad space, an auction occurs in the milliseconds before the page fully loads. During this auction, multiple advertising companies compete to show their ad to that specific user, with the highest bidder winning the right to display their advertisement.

46. This ecosystem involves several types of companies. Publishers are websites,

applications, or digital platforms with advertising space to sell. Supply-Side Platforms ("SSPs") are technology companies that help publishers maximize ad revenue by connecting them to multiple potential advertisers. Demand-Side Platforms ("DSPs") like NextRoll are hired by companies wanting to advertise their products and services online; these companies pay NextRoll to automatically bid in auctions and place their ads in front of targeted users on publishers' platforms.

47. In a critical blow to users' privacy, the auction process involves transmitting detailed user information to all potential bidders. When an RTB auction for digital-advertising space occurs, the SSP sends "bid requests" to multiple DSPs. Such bid requests typically include information such as the user's IP address, device information, browsing context, and available identifiers. The DSPs will use this information to calculate whether and how much to bid in the auction. Each DSP receives this data regardless of whether they bid or win, transforming the RTB system into a massive data transfer and collection network.

48. Individuals whose personal data is shared through RTB systems face imminent risk that their data will be sold and misused. Indeed, a letter penned by a group of bipartisan United States Senators noted that: "While only one company will win the auction, hundreds of firms participating receive sensitive information about the potential recipient of the ad—device identifiers and cookies, web browsing and location data, IP addresses, and unique demographic information such as age and gender…. Few Americans realize that some auction participants are siphoning off and storing 'bidstream' data to compile exhaustive dossiers about them. In turn, these dossiers are being openly sold to anyone with a credit card, including to hedge funds, political campaigns, and even to governments."[1]

49. Further raising alarm to this risk, in 2024, the Chair of the U.S. Federal Communications Commission warned that "the ease with which real-time bidding technology can be exploited to surveil Americans should raise serious alarm. Researchers report that no real

---

[1] Letter from Ron Wyden et al. to John Stankey, Chief Executive Officer, AT&T Inc. (Apr. 1, 2021), https://www.cassidy.senate.gov/wp-content/uploads/media/doc/040121%20Bidstream%20Letter%20to%20ATT.pdf

safeguards limit who can access, harness, or retain this data, suggesting that the multi-billion-dollar industry built around targeted advertising may presently leave Americans' sensitive data extraordinarily exposed."[2]

*1. Cookie Syncing: The Foundation of Cross-Site Tracking*

50. To recognize users during RTB auctions and to access the profiles it has built about them for strategic bidding, NextRoll establishes identity connections with other advertising platforms through a process called "cookie syncing." This process creates a shared identification system that enables NextRoll to track users across thousands of websites, far beyond those where its Tracking Technologies are installed.

51. Cookie syncing addresses a fundamental challenge: different companies assign different identifiers to the same user. An SSP might know a user as "User-123" while NextRoll knows them as "sa-user-id-ABC." Without synchronization, these platforms cannot coordinate their tracking and advertising efforts.

52. The syncing process occurs automatically when users visit websites. Their browser is invisibly redirected through multiple advertising domains in rapid succession, often dozens of redirects within seconds. During each redirect, platforms read their tracking cookies, share identifiers with each other, and build translation tables.

53. When NextRoll engages in cookie syncing during the RTB process, it sets or reads its Unique Identifiers, the same persistent identifier used by the AdRoll Pixel on client websites.

54. As part of this cookie syncing process, NextRoll also collects and records users' IP addresses. This enables NextRoll to create a comprehensive record merging data collected directly through NextRoll's AdRoll Pixel with data gathered through RTB participation, including partner platforms' identifiers, and users' general location information. Once established, these connections

---

[2] Lina M. Khan, Statement of Chair Lina M. Khan Joined by Commissioner Alvaro M. Bedoya & Commissioner Rebecca Kelly Slaughter, In the Matter of Mobilewalla, Inc., Commission File No. 2023196 (Dec. 3, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/statement-khan-bedoya-slaughter-mobilewalla.pdf

enable NextRoll to track users across any website participating in RTB, which is *de facto* virtually every website they visit.

55. Cookie syncing provides DSPs such as NextRoll with significant commercial advantages that extend far beyond individual advertising auctions. By establishing these identity connections, NextRoll transforms from a platform that can only recognize users on client websites to one that can track and monetize user data across the entire internet. This provides two critical commercial advantages.

56. First, cookie syncing enables effective bidding. When NextRoll recognizes a user through a synced identifier during an auction, it can instantly access its stored profile and bid strategically based on that user's browsing history, interests, and past website interactions. For instance, if NextRoll knows through the AdRoll Pixel that a user recently searched for "diabetes amputation" on a medical website, it can bid more aggressively on behalf of medical-device clients when that same user appears on a news website, knowing the user may be receptive to medical device advertisements. The same goes for a user who searches for "herpes diagnosis" or "spousal abuse." Without cookie syncing, NextRoll would be bidding blind.

57. Second, cookie syncing allows NextRoll to monetize user data regardless of auction outcomes. Every bid request contains fresh information about users' current activities—which websites they are visiting, when, and from where. Even when NextRoll does not bid or loses an auction, it still collects this behavioral data at no cost. While winning auctions requires payment, receiving bid requests costs nothing, allowing NextRoll to build comprehensive user profiles simply by participating in the RTB ecosystem.

58. NextRoll's consumer profiles create compounding value. It can accumulate detailed records of users' interests; noting, for example, who reads financial news in the morning, browses medical sites in the afternoon, and shops for products in the evening, without spending money on ad placements or requiring website owners to install its AdRoll Pixel. This behavioral intelligence is then packaged and sold to advertisers as NextRoll's audience insights and targeting capabilities.

The more data NextRoll collects, the more valuable its services become to advertisers who pay premium prices for precise targeting. According to NextRoll's materials, it leverages these "enriched audience profiles" across its entire product suite, creating powerful incentives for maximum data collection.

*2. Continuous Data Collection Thorugh Bid Requests*

59. After cookie syncing establishes the connections, NextRoll receives continuous data streams about users' online activities through RTB bid requests. Every time a synced user visits any website with advertising, potentially thousands of different sites, NextRoll receives fresh information about that visit.

60. When NextRoll participates in RTB auctions, it collects users' IP addresses, location data (such as "the postal/ZIP code [the user] was located in"), device identifiers, and information related to the context of the webpage that a user visited. Recording IP addresses serves NextRoll's commercial purpose of building detailed user profiles and improving its bidding strategies.

61. Through this RTB process, NextRoll functions as a pen register, systematically recording users' IP addresses and other data from thousands of websites as an undisclosed third party that the users have no knowledge of or relationship with. NextRoll records the IP address regardless of whether it bids on or wins the auction.

62. Moreover, the Unique Identifier that NextRoll uses for cookie syncing in the RTB ecosystem is the same identifier used by the AdRoll Pixel on client websites. This unified identifier enables NextRoll to aggregate data from both channels into comprehensive surveillance profiles. Thus, whether NextRoll learns about a user's healthcare searches through its Tracking Technologies installed on womenshealthnetwork.com or tracks that same user through RTB interactions on supplement websites, all of this activity is linked to the same Unique Identifier, creating detailed records that follow users across the internet.

*3. Example: Frontofficesports.com*

63. Frontofficesports.com illustrates how NextRoll's RTB tracking operates. When

users visit Frontofficesports.com, the website's advertising systems initiate cookie syncing with multiple partners. Network traffic analysis reveals users' browsers are redirected to NextRoll's servers, where NextRoll sets its Unique Identifiers and collects users' IP addresses. In observed examples, when an SSP named OpenX synchronized with NextRoll, NextRoll openly attached users' IP addresses to its response URLs, creating permanent records linking OpenX's identifiers, NextRoll's Unique Identifiers, and information about users' locations.

**C. Cross-Device Tracking**

64. NextRoll's privacy violations extend beyond tracking users on an individual device or browser; rather, NextRoll is designed to be inescapable. According to NextRoll's own documentation, the company employs sophisticated cross-device matching technology to identify and track the same individual, household, or Unique Identifiers across multiple devices, such as smartphones, laptops, connected TVs, smart speakers, or tablets. NextRoll utilizes this device-wide tracking to better know consumers activity and improve their ability to target them and measure ad campaigns.

65. NextRoll achieves this cross-device tracking through several methods, each occurring without user consent. First, through "deterministic" matching, NextRoll relies on tecnology that identifies offline personally identifiable information (like name, email address, address, phone number) and matches it to a single individual and then to that individual's device(s). Second, through "probabilistic" matching, NextRoll uses algorithms that analyze IP addresses, browsing patterns, device types, and temporal data to infer when different devices belong to the same person.

66. This cross-device tracking capability allows NextRoll to create a unified profile that follows a person from screen to screen, defeating any attempt by a user to protect their privacy by compartmentalizing their digital activity, such as moving from a work computer to a personal phone to maintain privacy when researching a non-work-related topic. NextRoll boasts that its technology can tell avoid showing a consumer ads on one device for a product he already purchased on another

device, and instead show him ads on one device that are informed by purchases made on other devices. It describes the ability of its "industry-leading technology" to "accurately build user profiles and identify them across the web, regardless of device, to deliver relevant ads that lead to increased sales conversions." NextRoll also states that it uses collected information to map devices and identifiers to individuals and households, generate inferences about interests and intent, and provide consumer-focused advertising and analytics services across channels and platforms.

67. NextRoll contrasts its ability to create unified identities with other advertisers who are limited to guessing based on solely IP address, stating that, to avoid guessing, its technology "leverages more than tracking pixels to build profiles that identify and match a user. [It] leverage[s] billions of points of proprietary data, plus the ability to onboard customers' offline data like email lists and information from CRM software like Salesforce or e-commerce platforms like Shopify, in a privacy-first way. This builds a unified identity that ensures the user sees the relevant ad, receives an appropriate email, or sends their information to another marketing system for future engagement. It allows our AdRoll and RollWorks customers to reach their target audience across devices, from smartphones to tablets and laptops. Its effectiveness is why many of our customers spend a significant amount of their budget accessing this cross-device traffic."

68. As such, NextRoll monetizes the personal information it collects for its own gain by operating as a data-driven advertising platform. NextRoll uses the profiles it builds without consent to offer increasingly sophisticated targeting services to advertisers, who pay premium prices to reach specific user segments based on their tracked behaviors and interests.

**D. Lack of User Consent**

69. Throughout all of these data collection activities, NextRoll operates without user consent. When users visit websites containing the Tracking Technologies or participating in RTB, they have no knowledge that NextRoll is collecting their personal information. Users are never presented with NextRoll's privacy policy, never agree to NextRoll's data collection, and have no opportunity to opt out before their data is transmitted to NextRoll's servers.

70. The data collection begins immediately when a webpage loads, before users can review any privacy policies or make choices about tracking. Even when users consent to a website's own privacy policy, this does not constitute consent for NextRoll's separate commercial data collection. California users do not expect, for example, that visiting a healthcare website means agreeing to have their health- or medical-related searches and identifying information shared with a data broker of which they have no knowledge so they may later be targeted with advertisements on other websites and devices.

71. Most users remain entirely unaware that NextRoll exists, much less that it maintains detailed profiles about information such as their healthcare searches and browsing patterns across thousands of websites, and ties that information to unique identifiers and geographic locations. Users cannot consent to something they do not know is occurring.

### E. NextRoll's Registration as a California Data Broker

72. NextRoll's formal registration in California as a data broker, according to the California Privacy Protection Agency, indicates that NextRoll actively collects, processes, and shares consumer information for commercial purposes. As a data broker, NextRoll aggregates user data from multiple sources, including browsing behavior, device-level data, and third-party partners, and uses that data to support media measurement, marketing research, and behavioral analysis.

## FACTS SPECIFIC TO PLAINTIFFS

73. During the Class Period, Plaintiffs visited one or more websites that deployed NextRoll's Scorecard Tag tracking technology, including BulkSupplements.com. Each Plaintiffs' personal information, including their IP address, device information, browsing activity, and persistent UID/XID cookie identifier, was intercepted and collected by NextRoll.

74. While located at his residence in California, Plaintiff Aidan Aarons visited BulkSupplements.com within the past year using the Chrome browser on his Android phone. On BulkSupplements.com, Mr. Aarons searched for, placed in his cart, and purchased numerous supplements to support his health, including supplements that may benefit metabolism, DNA repair,

insulin sensitivity, heart health, and fertility. Plaintiff also viewed, placed in his cart, and purchased supplements to support his dog's health after receiving a cancer diagnosis. Plaintiff Aarons has not consented to any privacy policy that BulkSupplements.com may have published and was not made aware of and did not consent to the operation of the Tracking Technologies on BulkSupplements.com. Mr. Aarons did not know that NextRoll was collecting his personal information when he visited BulkSupplements.com and never gave NextRoll consent to intercept his communications and collect data about him. After using BulkSupplements.com, Mr. Aarons has received advertisements on other websites related to his browsing activity on BulkSupplements.com.

75. While located at his residence in California, Plaintiff Pollard visited BulkSupplements.com within the past year using the Chrome browser on his Android phone. Mr. Pollard searched for, placed in his cart, and purchased several supplements to support his health, including supplements that may benefit muscle and brain health. Plaintiff Pollard does not have an account on BulkSupplements.com, has never subscribed to a newsletter from BulkSupplements.com, has not consented to any privacy policy that BulkSupplements.com may have published, and was not made aware of and did not consent to the operation of the Tracking Technologies on BulkSupplements.com. Mr. Pollard did not know that NextRoll was collecting his personal information when he visited BulkSupplements.com and never gave NextRoll consent to intercept his communications and collect data about him. After using BulkSupplements.com, Mr. Pollard has received advertisements on other websites related to his browsing activity on BulkSupplements.com.

76. Upon information and belief, NextRoll identified Plaintiffs and created profiles containing their likes and interests.

77. Plaintiffs did not know, nor have reason to know, that NextRoll surreptitiously collected information about their web activity (including their IP addresses and Unique Identifiers) and created profiles about their likes and interests for its own commercial gain.

78. Plaintiffs did not know that NextRoll was collecting their personal information when they visited these websites. Plaintiffs never gave NextRoll consent to intercept their communications and collect data about them.

## CLASS ACTION ALLEGATIONS

79. **Class Definition**: Plaintiffs Aidan Aarons and Sean Pollard bring this proposed class action pursuant to California Code of Civil Procedure § 382 on behalf of themselves and a Class of others similarly situated, defined as follows:

> All California residents who visited a website with the Tracking Technologies embedded, including WomensHealthNetwork.com, BulkSupplements.com, DrugBank.com, FrontOfficeSports.com, or who otherwise had their personal information collected by NextRoll through its tracking technology, during the Class Period.
>
> Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

80. **Numerosity**: The exact number of members of the Class ("Class Members") is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. Discovery will show that Defendant has surreptitiously collected and analyzed data from hundreds of thousands, if not millions, of consumers who fall into the definition of the Class. Class Members can be identified through Defendant's records.

81. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the putative Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class

include, but are not necessarily limited to the following:

A. Whether Defendant read, attempted to read, or learned the content of the communications made by Plaintiffs and the Class;

B. Whether Defendant's actions were willful;

C. Whether Defendant had the capability to and/or used Plaintiffs' and the Class Members' communications for its own purposes;

D. Whether Defendant's software is a pen register;

E. Whether Defendant accessed Plaintiffs' and the Class Members' computer systems; and

F. Whether Defendant obtained consent from Plaintiffs and Class Members.

82. **Typicality**: Plaintiffs' claims are typical of the claims of the Class Members in that Plaintiffs, like all Class Members, have been injured by Defendants' misconduct at issue.

83. **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class. That is, Plaintiffs and the Class Members sustained damages as a result of Defendant's conduct. Plaintiffs also have no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

84. **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive

supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

85. Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violation of Cal. Penal Code § 631**
**(<u>On behalf of Plaintiffs and the Class</u>)**

86. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

87. To establish liability under CIPA § 631(a), a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

88. Defendant's Tracking Technologies and software, including the AdRoll Pixel, is a

"machine, instrument, contrivance" used to collect communications.

89. When Plaintiffs and Class Members communicate with websites by clicking links, viewing pages, communicating search terms, placing products in their carts, or purchasing products, these interactions constitute communications containing content and meaning. This includes URLs visited, webpage content accessed, and user interactions, all of which are "contents" of communications under CIPA.

90. Defendants, through the Tracking Technologies embedded on various websites, intercept these communications while they are in transit. Specifically, when users interact with a website, the AdRoll Pixel causes their browsers to simultaneously transmit the contents of those communications to NextRoll's servers at ad.ipredictive.com. This interception occurs in real-time as users' communications are being sent to the intended website.

91. Defendant willfully reads, analyzes, and learns the contents and meaning of these intercepted communications as they are in transit. The transmitted data is processed by NextRoll's systems to extract URLs, user interactions, including search terms, products placed in carts and purchased, and other communication contents, which Defendant uses to build detailed user profiles and provide targeted advertising services.

92. Plaintiffs and Class Members did not consent to Defendant intercepting, reading, or using their communications. No notice was provided, and no opportunity to consent was given before the interceptions began.

93. Defendant uses the intercepted communications for its own commercial purposes, including building user profiles, enhancing advertising services, and generating revenue. This use demonstrates that Defendant is not acting as a mere extension of the websites but as an independent party exploiting intercepted communications.

94. Defendant's systematic interception and use of Plaintiffs' and Class Members' communications while in transit violates Cal. Penal Code § 631(a).

95. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class seek statutory damages

of $5,000 per violation and injunctive relief.

**SECOND CAUSE OF ACTION**
**Violation of Cal. Penal Code § 638.51**
**(On behalf of Plaintiffs and the Class)**

96. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

97. California law prohibits the installation of a pen register without first obtaining a court order. Cal. Penal Code § 638.51.

98. The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

99. Defendant's Tracking Technologies, including its AdRoll Pixel, is a "pen register" because it is a device or process that records addressing or signaling information, in this instance, Plaintiffs' and Class Members' IP addresses, the websites they visited, derived location information, device identifiers, and other persistent identifiers, from electronic communications transmitted by their devices. Furthermore, Defendant's software is a device or process that identifies consumers, gathers data, and correlates it, building comprehensive profiles of users and their online activities.

100. Defendant was not authorized by any court order to use a pen register to track Plaintiffs' and Class Members' IP addresses, location and personal information, nor did they obtain consent from Plaintiffs and the Class to operate such a device.

101. Defendant's systematic recording of Plaintiffs' and Class Members' IP addresses and other routing, addressing, and signaling information, without a court order or user consent, violates Cal. Penal Code § 638.51.

102. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class seek statutory damages of $5,000 per violation and injunctive relief.

**THIRD CAUSE OF ACTION**
**Unlawful Recording of and Eavesdropping Upon Confidential Communications**
**Violation of Cal. Penal Code § 632**
**(<u>On behalf of Plaintiffs and the Class</u>)**

103. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

104. California Penal Code § 632 prohibits using "an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication . . . intentionally and without the consent of all parties to a confidential communication."

105. Defendant's Tracking Technologies, including its AdRoll Pixel, are electronic amplifying or recording devices for purposes of § 632. The Tracking Technologies duplicate and record users' interactions in real-time as they navigate webpages, including search terms entered, links clicked, pages viewed, products placed in shopping carts, and products purchased. The Tracking Technologies also collect and record information from the browser, such as language settings, browser type, operating system, device information, and IP address.

106. Section 632 defines a "confidential communication" to include "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."

107. Plaintiffs' and Class Members' communications with websites deploying the Tracking Technologies were confidential communications for purposes of § 632. These communications included sensitive healthcare products and activity on websites such as BulkSupplements.com, where users searched for health products related to their health conditions. Users reasonably expected these communications to remain between themselves and the websites they chose to visit, not to be secretly recorded by an undisclosed third-party data broker and used for identification and targetted advertising across the internet.

108. Because Defendant did not disclose to Plaintiffs or Class Members that their private communications were being recorded and eavesdropped upon by NextRoll, Defendant did not obtain,

and could not have obtained, Plaintiffs' or Class Members' express or implied advance consent to NextRoll's recording or monitoring of those communications. As a result, Plaintiffs and Class Members had an objectively reasonable expectation that their confidential communications were not being recorded and eavesdropped upon by NextRoll.

109. That expectation and its objective reasonableness arise, in part, from: (i) the objective offensiveness of surreptitiously recording and eavesdropping upon people's private communications, particularly those involving sensitive health products; (ii) the ease with which disclosure or warning could have been provided; and (iii) the absence of any direct relationship between Plaintiff and Class Members and NextRoll that would put them on notice of NextRoll's involvement.

110. Plaintiffs and Class Members expected that their personal and private communications with the websites they visited would not be intercepted and secretly recorded and eavesdropped upon by undisclosed third parties such as NextRoll.

111. By embedding the Tracking Technologies on publisher websites and using those technologies to contemporaneously intercept, redirect, and record Plaintiffs' and Class Members' confidential communications, Defendant eavesdropped upon and recorded website users' confidential communications through an electronic amplifying or recording device, in violation of § 632.

112. At no time did Plaintiffs or Class Members consent to Defendant's unlawful conduct. Nor could Plaintiffs or Class Members reasonably expect that their confidential communications with websites such as BulkSupplements.com would be overheard or recorded by NextRoll, an entity with whom they have no relationship and of whose existence they were unaware.

113. Upon information and belief, Defendant utilized Plaintiffs' and Class Members' sensitive personal information, including their pages views and shopping activity for health-related products, for Defendants's own commercial purposes, including building user profiles, enhancing media measurement and analytics services, and generating more than $150 million in annual revenue.

114. Defendant's intentional eavesdropping upon and recording of Plaintiffs' and Class Members' confidential communications, without their consent, violates Cal. Penal Code § 632.

115. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class seek statutory damages of $5,000 per violation and injunctive relief.

**FOURTH CAUSE OF ACTION**
**California Comprehensive Computer Data Access and Fraud Act**
**Violation of Cal. Penal Code § 502**
**(On behalf of Plaintiffs and the Class)**

116. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

117. The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act ("CDAFA") to "expand the degree of protection afforded to individuals ... from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). In enacting the statute, the Legislature emphasized the need to protect individual privacy: "The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals." *Id*.

118. Plaintiffs' and Class Members' devices are "computers" or "computer systems" within the meaning of § 502(b) because they are devices capable of being used in conjunction with external files and perform functions such as logic, arithmetic, data storage and retrieval, and communication.

119. Defendant violated the following sections of CDAFA § 502(c):

(a) "Knowingly accesses and without permission... uses any data, computer, computer system, or computer network in order to ... wrongfully control or obtain money, property, or data." *Id*. § 502(c)(1).

(b) "Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network." *Id*. § 502(c)(2).

(c) "Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network." *Id*. § 502(c)(7).

120. Defendant knowingly "accessed" Plaintiffs' and the Class Members' computers and/or

computer systems because they purposefully gained entry to and/or caused output from their computers to obtain personal information, including browsing data, device identifiers, IP addresses, and tracking cookies.

121. Plaintiffs and the Class suffered damage and/or loss resulting from Defendant's conduct described herein. Specifically: (1) Defendant's software occupied Plaintiffs' and the Class Members' storage space on their devices without authorization; (2) Defendant's software caused data to be output from Plaintiffs' and the Class Member's devices; (3) Defendant's acts used computer resources of the aformentioned devices; and (4) Defendant was unjustly enriched and profited from the data taken from Plaintiffs and the Class.

122. Plaintiffs and the Class now seek compensatory damages, injunctive relief, disgorgement of profits, other equitable relief, punitive damages, and attorneys' fees pursuant to § 502(e)(1)–(2).

**FIFTH CAUSE OF ACTION**
**Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*.**
**(On behalf of Plaintiffs and the Class)**

123. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

124. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

125. The ECPA protects both the sending and the receipt of communications.

126. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

127. The transmission of Plaintiffs' website page visits, selections, shopping activity, and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

128. The transmission of this information between Plaintiffs and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals,

writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

129. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

130. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

131. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

132. The following instruments constitute "devices" within the meaning of the ECPA:

- The Tracking Technologies, including the AdRoll Pixel described above;
- Any other tracking code, SDK, or JavaScript snippets used by Defendant;
- Any cookies, including the UID/XID cookies, used by Defendant;
- The plan Defendant carried out to effectuate the tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to navigate the Website.

133. Plaintiffs and Class Members' interactions with each website are electronic communications under the ECPA.

134. By utilizing the AdRoll Pixel and other tracking technologies, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class members in violation of 18 U.S.C. § 2511(1)(a).

135. Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their sensitive medical and health-

related information. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

136. By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

137. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, CDAFA, and other state wiretapping and data privacy laws, among others.

138. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, the association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies the crime-tort exception because it violate[s] state law, including CIPA, intrusion upon seclusion, and invasion of privacy.

139. Defendant was not acting under the color of law to intercept Plaintiffs' and Class members' wire or electronic communications.

140. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy. Plaintiffs and Class Members had a reasonable expectation that Defendant would not intercept their communications for its own commercial benefit and for the benefit of third-parties without their knowledge or consent.

141. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. §§ 2511(1), *et seq*.

142. As a result of each and every violation thereof, on behalf of themselves and the Class,

Plaintiffs seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. §§ 2520(c)(2)(B).

**SIXTH CAUSE OF ACTION**
**Invasion of Privacy**
**Violation of Art. 1, § 1 of the California Constitution**
**(On Behalf of Plaintiffs and the Class)**

143. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

144. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

145. The right to privacy in California's Constitution creates a right of action against private entities such as Defendants. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

146. Plaintiffs and Class Members have a legally protected privacy interest in their IP addresses, location data, substantive communications, other routing information that NextRoll captures without notice or consent when they access and view websites implementing NextRoll's Tracking Technologies. These privacy interests are recognized by the California Constitution, CDAFA, and CIPA.

147. Plaintiffs and Class Members had a reasonable expectation of privacy concerning this data when navigating the internet. NextRoll is a third-party data broker with whom Plaintiffs and Class Members have no direct relationship. Nevertheless, NextRoll through its publisher-websites that deploy its tracking technology collects Plaintiffs' and Class Members' IP addresses, page views, browsing history, location data, device information, and other routing information together with

unique identifiers capable of identify Plaintiffs and Class Members across multiple unrelated websites. NextRoll also uses this information to build comprehensive profiles of their online activities.

148. The identifiable and private information NextRoll intercepted, stored, and used without Plaintiffs' and Class Members' consent was used to track them consistently and persistently across multiple websites and to provide targeted measurement and analytics services. The manner in which NextRoll intercepted this information deliberately circumvented established privacy-protection mechanisms and violated social norms.

149. Defendant's conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person because: (i) the information collected by NextRoll is personally identifying information protected by the California Constitution and numerous statutes; (ii) NextRoll creates comprehensive profiles of users by linking their activities across multiple unrelated websites; (iii) NextRoll did not have authorization or consent to collect users' IP addresses and other routing information; and (iv) this invasion deprived Plaintiffs and Class Members of the ability to control the dissemination and use of their personal information, an ability that is a fundamental privacy right.

150. Reasonable individuals do not expect that there is an entity intercepting and monitoring their personally identifiable online activity across multiple websites, let alone using this information for profit through its cookie syncing and behavioral targeting services.

151. Defendant's conduct violated the privacy of hundreds of thousands (if not millions) of Class Members, including Plaintiffs. Defendant did not have consent to intercept this information, let alone use and monetize it.

152. As a direct and proximate result of Defendant' actions, Plaintiffs and Class Members have had their privacy invaded and have sustained injury, including the loss of control over their personal information.

153. Plaintiffs and Class Members seek appropriate relief for those injuries, including but

not limited to restitution, disgorgement of profits earned by Defendant because of, by way of or in connection with the intrusions upon Plaintiffs' and Class Members' privacy, nominal damages, and all other equitable relief that will compensate Plaintiffs and Class Members properly for the harm to their privacy interests.

154. Plaintiffs also seek such other relief as the Court may deem just and proper.

**SEVENTH CAUSE OF ACTION**
**Violation of the Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(<u>On Behalf of Plaintiffs and the Class</u>)**

155. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

156. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

157. Defendant engaged in unlawful business practices in connection with its unauthorized collection of Plaintiffs' and Class Members' private information, in violation of the UCL.

158. The acts, omissions, and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

159. Defendant violated the "unlawful" prong of the UCL by violating, *inter alia*, Plaintiffs and Class Members' constitutional rights to privacy, state privacy statutes, and state consumer protection statutes.

160. Defendant's acts, omissions, and conduct also violate the "unfair" prong of the UCL because those acts, omissions, and conduct, as alleged therein, offended public policy (including state privacy statutes and state consumer protection statutes) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and Class Members.

161. The harm caused by Defendant's conduct outweighs any potential benefits attributable to such conduct, and there were reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described herein.

162. As a result of Defendant's violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, including but not limited to valuable consideration, e.g., access to and control of their private and personal data. Plaintiffs' and Class Members' personal data, including web browsing and device data and personally identifying and addressing information, has monetary value. Defendant deprived Plaintiffs and Class Members of that valuable data without providing just compensation. Plaintiffs and Class Members would not have used certain websites had they known Defendant was disclosing their personally identifying and addressing information to third parties through those sites.

163. UCL § 17203 provides that the Court may restore to any person in interest any money or property which may have been acquired by means of unfair, deceptive, and fraudulent business acts and practices and may order restitution to Plaintiffs. Plaintiffs and Class Members are entitled under UCL §§ 17203 and 17208 to restitution and restoration of all ill-gotten money and property belonging to Plaintiffs and Class Members in Defendant's possession.

164. As a result of Defendant's violations of the UCL, Plaintiffs and Class Members are further entitled to injunctive relief prohibiting Defendant's unlawful and unfair business activities and practices, including an injunction terminating all further distributions of Plaintiffs and Class Members' personal data. This is particularly true since the dissemination of Plaintiffs and Class Members' information is ongoing.

165. Plaintiffs additionally seek any and all other equitable relief that the Court deems just and proper.

**EIGTH CAUSE OF ACTION**
**Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(<u>On Behalf of Plaintiffs and the Class</u>)**

166. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

167. To state a claim for intrusion upon seclusion, Plaintiffs must establish that: (1) the defendant intruded on a place, conversation, or matter in which Plaintiffs had a reasonable expectation of privacy; and (2) the intrusion would be highly offensive to a reasonable person.

168. Defendant's collection, interception, and use of Plaintiffs' and Class Members' personally identifiable information, including IP addresses, browsing history, page views, location information, device identifiers, and unique identifiers constitute an intentional intrusion. NextRoll's use of this information to create detailed profiles of individuals through its tracking technology, which tracks and profiles Plaintiffs and Class Members across multiple unrelated websites, likewise constitutes an intentional intrusion.

169. Plaintiffs and Class Members reasonably expected that their IP addresses, location data, and other personal information would not be intercepted, collected, and used by NextRoll, a third-party data broker with whom they have no direct relationship.

170. This expectation is particularly reasonable given that NextRoll operates entirely behind the scenes, with no visible interface for users, no direct services provided to users, and no opportunity for users to review or consent to NextRoll's privacy practices.

171. The information NextRoll collects is especially sensitive because it includes IP addresses (which reveal users' geographic locations) and is used to create comprehensive profiles tracking users' activities across multiple unrelated websites.

172. Plaintiffs and Class Members did not consent to, authorize, or understand NextRoll's interception or use of their private data.

173. Defendant's conduct is highly offensive to a reasonable person because: (a) it violates established social norms and expectations regarding online privacy; (b) it occurs without users' knowledge or consent and provides no opportunity for users to opt out; (c) it creates comprehensive profiles of users' online activities across multiple unrelated websites and across devices; and (d) it monetizes users' personal information for Defendant's commercial gain without their knowledge or compensation.

174. Defendant's conduct caused Plaintiffs and Class Members harm, including a violation of their privacy interests, loss of control over their personal information, and emotional distress from the knowledge that their online activities have been secretly monitored and profiled.

175. Plaintiffs and Class Members seek damages to compensate for the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Defendant as a result of their intrusion upon seclusion.

176. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

177. Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Aidan Aarons and Sean Pollard individually and on behalf of the Class, pray for the following relief:

(a) An order certifying the Class as defined above, appointing Aidan Aarons and Sean Michael Pollard as the representatives of the Class, and appointing their counsel as Class Counsel;

(b) An order declaring that Defendants' actions, as set out above, violate Cal. Pen. Code § 631, Cal. Pen. Code § 638.51, Cal. Pen. Code § 632, Cal. Pen. Code § 502, Art. 1, § 1 of the California Constitution, Cal. Bus. & Prof. Code § 17200, 18 U.S.C. § 2511(1), *et seq*., and constitute a common law invasion of privacy.

(c) An injunction requiring Defendant to cease all unlawful activities;

(d) An award of compensatory damages, statutory damages, restitution, disgorgement of profits, punitive damages, costs, attorneys' fees, and any other monetary relief available;

(e) Such other and further relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

**AIDAN AARONS** and **SEAN POLLARD,** individually and on behalf of all others similarly situated,

Dated: June 10, 2026

By: *<u>/s/ Matthew W. Ruan</u>*
Matthew W. Ruan (SBN 264409)
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@jjlmlaw.com

Jonathan M. Jagher*
Nicholas R. Lange*
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
jjagher@jjlmlaw.com
nlange@jjlmlaw.com

***Attorneys for Plaintiff and the Putative Class***

*****Pro Hac Vice application forthcoming*

# EXHIBIT B

Contact Us

THE SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO

Case Number: CGC26637769
Title: AIDAN AARONS ET AL VS. NEXTROLL, INC.
Cause of Action: OTHER NON EXEMPT COMPLAINTS (CLASS ACTION COMPLAINT)
Generated: 2026-08-18 4:10 pm

Register of Actions Parties Attorneys Calendar Payments Documents

**Please Note: The "View" document links on this web page are valid until 4:20:34 pm**
**After that, please refresh your web browser. (by pressing Command +R for Mac, pressing F5 for Windows or clicking the refresh button on your web browser)**

# Register of Actions

Show 10 entries Search:

| Date | Proceedings | Document | Fee |
|---|---|---|---|
| 2026-08-03 | APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION (TRANSACTION ID # 80191957) FILED BY PLAINTIFF AARONS, AIDAN INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED POLLARD, SEAN INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED | View | $60.00 |
| 2026-07-24 | ORDER DENYING COMPLEX DESIGNATION FOR FAILURE TO FILE APPLICATION REQUESTING DESIGNATION. | View | |
| 2026-07-13 | SUMMONS ISSUED (TRANSACTION ID # 79982998) TO PLAINTIFF AARONS, AIDAN INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED | View | |

| Date | Proceedings | Document | Fee |
|---|---|---|---|
| | POLLARD, SEAN INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED | | |
| 2026-06-10 | NOTICE TO PLAINTIFF | View | |
| 2026-06-10 | CIVIL CASE COVERSHEET FILED (TRANSACTION ID # 79717557) FILED BY PLAINTIFF AARONS, AIDAN INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED POLLARD, SEAN INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED | View | |
| 2026-06-10 | OTHER NON EXEMPT COMPLAINTS, COMPLAINT (TRANSACTION ID # 79717557) FILED BY PLAINTIFF AARONS, AIDAN INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED POLLARD, SEAN INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED AS TO DEFENDANT NEXTROLL, INC. A DELAWARE CORPORATION NO SUMMONS ISSUED, JUDICIAL COUNCIL CIVIL CASE COVER SHEET NOT FILED CASE MANAGEMENT CONFERENCE SCHEDULED FOR DEC-09-2026 PROOF OF SERVICE DUE ON SEP-08-2026 CASE MANAGEMENT STATEMENT DUE ON NOV-16-2026 COMPLEX LITIGATION ASSIGNMENT REQUESTED BY FILING PARTIES; FEE INCLUDED IN FILING FEE CLASS ACTION | View | $1435.00 |

Showing 1 to 6 of 6 entries

Previous 1 Next

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY STATE BAR NUMBER: 264409
NAME: Matthew W. Ruan
FIRM NAME: Justice Jagher London & Millen LLC
STREET ADDRESS: 100 Tri-State International, Suite 128
CITY: Lincolnshire STATE: IL ZIP CODE: 60069
TELEPHONE NO.: (224) 632-4500 FAX NO.: (224) 632-4521
EMAIL ADDRESS: mruan@jjlmlaw.com
ATTORNEY FOR (*name*): Plaintiffs Aidan Aarons and Sean Pollard

*FOR COURT USE ONLY*

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**06/10/2026**
**Clerk of the Court**
**BY: ERNALYN BURA**
**Deputy Clerk**

**CGC-26-637769**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street San Francisco, CA 94102
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
Aarons, et al., v. NextRoll, Inc., a Delaware corporation

**CIVIL CASE COVER SHEET**

[X] **Unlimited** (Amount demanded exceeds $35,000)
[ ] **Limited** (Amount demanded is $35,000 or less)

**Complex Case Designation**

[ ] Counter [ ] Joinder

Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER:

JUDGE:

DEPT.:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Asbestos**
- [ ] Asbestos (04)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/Unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [X] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Employment Development Department (EDD)**
- [ ] EDD decision review (48)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.404)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Comprehensive groundwater adjudication (47)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (*not specified above*) (43)

2. Is this case complex under rule 3.400 of the California Rules of Court? [x] Yes [ ] No

If the case is complex, mark the factors requiring exceptional judicial management:

a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [x] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [x] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):*

a. [x] monetary
b. [ ] nonmonetary; declaratory or injunctive relief
c. [ ] punitive

4. Number of causes of action *(specify):* 8 - Violation of Cal. Penal Code § 631, Violation of Cal. Penal Code § 638.51

5. Is this case a class action suit? [x] Yes [ ] No

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 10, 2026

Matthew W. Ruan ▶ *Matthew W. Ruan*

(TYPE OR PRINT NAME) (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 of the California Rules of Court or a complex case, this cover sheet will be used for statistical purposes only.

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on pages 1 and 2. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 of the California Rules of Court is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $35,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**SEE PAGE 3 FOR INFORMATION PURPOSES ONLY.**

## CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/ Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Asbestos**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/Wrongful Death

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Product Liability *(not asbestos or toxic/ environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice–Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collections Case–Seller Plaintiff
- Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord-tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition re Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Employment Development Department (EDD)**
- EDD Decision Review (48) *(if the case involves an Employment Development Department decision, check this item instead of Wrongful Termination or Other Employment)*

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Comprehensive Groundwater Adjudication (47)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister-State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only Injunctive Relief Only *(non-harassment)*
  - Mechanic's Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

# NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:** **DEC 09, 2026**

**TIME:** **10:30 am**

**PLACE:** **Department 610**
**400 McAllister Street**
**San Francisco, CA 94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION, AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint. (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400 McAllister Street, Room 103-A**
**San Francisco, CA 94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

# Superior Court of California, County of San Francisco
## Information Sheet
## Voluntary Expedited Jury Trial Summary

The San Francisco Superior Court encourages the use of Voluntary Expedited Jury Trials ("EJTs") in appropriate cases. EJTs provide an excellent opportunity to resolve your client's case in an expeditious and inexpensive way. Voluntary EJTs are authorized by statute. CCP §§ 630.01.

EJTs can resolve your entire case **or** a single important case critical issue that, once adjudicated, can promote resolution of the entire case (for example: course and scope of employment, causation of an injury, whether a contract was formed, etc.) EJTs promote equal access to civil justice as they are less expensive, consume fewer courtroom days, provide flexibility throughout, encourage high/low agreements to limit risk, and feature streamlined pre-trial procedures.

These are highlights of an EJT (C.C.P. §§ 630.01 et seq. and Rules of Court 3.1549 - 3.1553):

- Parties encouraged to submit a joint jury questionnaire;
- 8 jurors (6 must agree);
- 3 peremptory challenges per side;
- 5-hour time limit per side unless agreed otherwise and approved;
- One to two court days completion unless agreed otherwise and approved;
- Option to present evidence by stipulation and objection;
- High/low arrangement option;
- Limited appeal (misconduct by judge or jury substantially affecting parties' rights or corruption, or bad faith.)

If the parties agree to the Voluntary EJT, they should file and serve the completed and signed (Proposed) Consent Order for Voluntary Expedited Jury Trial, Judicial Council Form EJT-020.

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

***FOR COURT USE ONLY***
***(SOLO PARA USO DE LA CORTE)***

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
NextRoll, Inc., a Delaware corporation

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
Aidan Aarons and Sean Pollard, individually and on behalf of all others similarly situated

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Civic Center Courthouse
400 McAllister Street San Francisco, CA 94102

CASE NUMBER:
*(Número del Caso):*
**CGC-26-637769**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Matthew Ruan 100 Tri-State International, Suite 128 Lincolnshire, IL 60069 Telephone: (224) 632-4500

DATE: *(Fecha)* **07/13/2026** Clerk, by *(Secretario)* **SANDRA SCHIRO** , Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

SUPERIOR COURT OF CALIFORNIA COUNTY OF SAN FRANCISCO

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*:

Contact Us

THE SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN FRANCISCO

# Document Error

The document you are trying to view is not available. Please try again later or email courtwebadmin@sftc.org with the date, time and nature of your request.

Close Window

Matthew W. Ruan (SBN 264409)
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@jjlmlaw.com

Nicholas R. Lange (*pro hac vice* forthcoming)
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
nlange@jjlmlaw.com

*Counsel for Plaintiffs and the Proposed Class*

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**08/03/2026**
**Clerk of the Court**
**BY: EDWARD SANTOS**
**Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SAN FRANCISCO**

AIDAN AARONS and SEAN POLLARD, individually and on behalf of all others similarly situated,

*Plaintiffs,*

v.

NEXTROLL, INC., a Delaware corporation,

*Defendant.*

Civil Action No. CGC-26-637769

**APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION**

## I. INTRODUCTION

In compliance with Local Rule 3.5 of the Superior Court of California, County of San Francisco, Plaintiffs Aidan Aarons and Sean Pollard ("Plaintiffs") submit this application for this case to be designated as a complex civil litigation case and assigned to the San Francisco Superior Court Complex Civil Litigation Department. For the reasons stated below, Plaintiffs anticipate that this matter will involve a substantial amount of documentary evidence and require substantial post judgment judicial supervision.

Plaintiffs indicated on the Civil Cover Sheet that they designate this case as complex. Furthermore, Plaintiffs paid the complex filing fee at the time the Complaint was filed as required by California Government Code § 70616. Attached as Exhibit A is a file stamped copy of the Complaint. Additionally, attached as Exhibit B is a file stamped copy of the Civil Cover Sheet.

## II. SUMMARY OF RELEVANT FACTS

On June 10, 2026, Plaintiffs, who are each residents of California, filed this class action case against NextRoll, Inc. ("Defendant" or "NextRoll"), a corporation organized under the laws of Delaware, with its principal place of business in San Francisco, California. Plaintiffs allege that NextRoll embedded Tracking Technologies, including through its flagship advertising product, "AdRoll", to collect individuals' IP addresses, including browsing data.

Plaintiffs allege the following eight causes of action against the Defendant for its unlawful actions: (1) Violation of Cal. Penal Code § 631; (2) Violation of Cal. Penal Code § 638.51; (3) Violation of Cal. Penal Code § 632; (4) Violation of Cal. Penal Code § 502; (5) Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq.*; (6) Violation of the California Constitution Art. 1, § 1; (7) Violation of Cal. Bus. & Prof. Code § 17200, *et seq.*; and (8) Common Law Invasion of Privacy – Intrusion Upon Seclusion. The class definition for this matter is defined in paragraph 79 of the Complaint:

> All California residents who visited a website with the Tracking Technologies embedded, including WomensHealthNetwork.com, BulkSupplements.com, DrugBank.com, FrontOfficeSports.com, or who otherwise had their personal information collected by NextRoll through its tracking technology, during the Class Period.

> Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

## III. LEGAL DISCUSSION

### A. This Case Meets The Standards To Be Designated As Complex.

Pursuant to California Rule of Court 3.400(a), a complex case "is an action that requires exceptional judicial management to avoid placing unnecessary burdens on the court or the litigants and to expedite the case, keep costs reasonable, and promote effective decision making by the court, the parties, and counsel." In compliance with Local Rule 3.5(C)(2), a party seeking complex designation must file an application stating the reasons why the case should be designated as complex.

California Rule of Court 3.400(c)(6) states that "an action is provisionally a complex case if it involves one or more of the following types of claims: (1) Antitrust or trade regulation claims; (2) Construction defect claims involving many parties or structures; (3) Securities claims or investment losses involving many parties; (4) Environmental or toxic tort claims involving many parties; (5) Claims involving mass torts; (6) Claims involving class actions; or (7) Insurance coverage claims arising out of any of the claims listed in (c)(1) through (c)(6)." In addition, the Court is to consider a number of factors when designating a case as complex, including the likelihood of: "(1) numerous pretrial motions raising difficult or novel legal issues that will be time-consuming to resolve; (2) management of a large number of witnesses or a substantial amount of documentary evidence; (3) management of a large number of separately represented parties; (4) coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court; or (5) substantial postjudgment judicial supervision." *Id*. at 3.400(b).

No single enumerated factor is controlling, as "'[c]omplex litigation is not capable of precise definition but may involve, for example, multiple related cases, extensive pretrial activity, extended trial times, difficult or novel issues, and postjudgment judicial supervision, or may concern special categories such as class actions.'" *First State Ins. Co. v. Superior Court*, 79 Cal. App. 4th 324, 332 (2000) (citation

omitted). Indeed, "no particular criterion is controlling and each situation must be examined separately." *Id*. Here, many of the enumerated factors support designation of this class action case as complex.

**B. This Case Involves Management of A Substantial Quantity of Documentary Evidence.**

In order to show that the Defendant allegedly used pen registers and the Tracking Technologies, a significant amount of documents will need to be produced. Furthermore, this matter may require document production from third parties to show that NextRoll captured their IP addresses, geolocation data, device information, browsing data, and persistent cookie identifiers. Complaint, ¶3. For example, Plaintiffs allege that, "NextRoll is an advertising, analytics, and data broker company that secretly tracks consumers across the internet through invisible tracking code (the "Tracking Technologies"). These Tracking Technologies are clandestinely embedded on thousands of websites. They assign unique identifiers to website users and intercept users' communications made on various websites in real-time, including their browser and device information, geolocation information, and user activity, including pages visited, search terms, products viewed, purchased, or added to shopping carts, and interactions with sensitive health content." Complaint, ¶2. Due to the technical nature of this documentary evidence, the Parties may also require expert discovery.

**C. This Case Will Require Post-Judgment Judicial Supervision.**

If this matter settles, it will require post-judgment judicial supervision. Class action cases require that the Court supervises the briefings of motions for preliminary and final approval of the settlement, distributions of awards to class members, the class notice plan, settlement relief, attorneys' fees, incentive awards, and administration fees. By deeming this action complex, the Parties can draw upon the experience of the Complex Division, and may more efficiently, resolve any anticipated disputes before them.

**IV. CONCLUSION**

For all the reasons set forth above, Plaintiffs respectfully request the Court designate this case as complex under California Rule of Court 3.400 and San Francisco Superior Court Local Rule 3.5(C).

Dated: August 3, 2026

Respectfully submitted,

/s/ Matthew W. Ruan
Matthew W. Ruan (SBN 264409)
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@jjlmlaw.com

Jonathan M. Jagher*
Nicholas R. Lange*
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
jjagher@jjlmlaw.com
nlange@jjlmlaw.com

***Attorneys for Plaintiff and the Putative Class***

*****_Pro Hac Vice application forthcoming_

**PROOF OF SERVICE**

I am a resident of the State of Illinois, over the age of eighteen years, and not a party to the within action. My business address is 100 Tri-State International, Suite 128, Lincolnshire, IL 60069. On August 3, 2026, I caused to be served the within document(s):

**APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION**

by having the document(s) listed above placed in a sealed envelope with postage thereon fully prepaid and addressed to:

NextRoll, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on August 3, 2026, at Lincolnshire, IL.

*/s/ Danielle Millikan*
Danielle Millikan

# EXHIBIT C

Brett N. Taylor (SBN 274400)
btaylor@cozen.com
Matthew E. Lewitz (SBN 325379)
mlewitz@cozen.com
Madeline J. Suchard (SBN 328662)
msuchard@cozen.com
COZEN O'CONNOR
401 Wilshire Boulevard, Suite 850
Santa Monica, CA 90401
Telephone: 310.393.4000
Facsimile: 310.394.4700

Attorneys for Defendant NextRoll, Inc.

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| AIDIN AARONS and SEAN POLLARD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NEXTROLL, INC., a Delaware corporation,<br><br>Defendant. | Case No. CGC-26-637769<br><br>[Assigned to the Hon. Rochelle C. East]<br><br>**NOTICE TO STATE COURT AND ADVERSE PARTIES OF REMOVAL TO FEDERAL COURT AND OF STAY OF STATE COURT PROCEEDINGS**<br><br>Complaint Filed: June 10, 2026<br>Trial Date: None Set |

**TO ALL PARTIES AND TO THE CLERK OF THE SUPERIOR COURT:**

**PLEASE TAKE NOTICE** that Defendant NextRoll, Inc. ("Defendant") filed a Notice of Removal in the United States District Court for the Northern District of California, pursuant to 28 U.S.C. §§ 1331, 1367, 1441, and 1446. A true and correct copy of the Notice of Removal is attached as **Exhibit 1** (without exhibits).

**PLEASE TAKE FURTHER NOTICE** that pursuant to 28 U.S.C. § 1446(d), the filing of the Notice of Removal in the United States District Court, together with the filing of this notice with this Court, effects removal of this action. Therefore, this Court may proceed no further with Plaintiffs' action unless and until the action is remanded.

Dated: August 19, 2026

COZEN O'CONNOR

By: ______________________________

Brett N. Taylor
Matthew E. Lewitz
Madeline J. Suchard
Attorney for Defendant NextRoll, Inc.

# EXHIBIT 1

Brett N. Taylor (SBN 274400)
btaylor@cozen.com
Matthew E. Lewitz (SBN 325379)
mlewitz@cozen.com
Madeline J. Suchard (SBN 328662)
msuchard@cozen.com
COZEN O'CONNOR
401 Wilshire Boulevard, Suite 850
Santa Monica, CA 90401
Telephone: 310.393.4000
Facsimile: 310.394.4700

Attorneys for Defendant NextRoll, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIDAN AARONS and SEAN POLLARD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NEXTROLL, INC., a Delaware corporation,<br><br>Defendant. | Case No.<br><br>[San Francisco Superior Court Case No. CGC-26-637769]<br><br>**DEFENDANT NEXTROLL, INC.'S NOTICE OF REMOVAL**<br><br>[28 U.S.C. § 1331, 1367, 1441, AND 1446]<br><br>[Declaration of Matthew E. Lewitz Served and Filed Concurrently Herewith] |

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT AND TO ALL PARTIES:**

**PLEASE TAKE NOTICE** that Defendant NextRoll, Inc. ("Defendant" or "NextRoll") hereby removes this action filed in the California Superior Court for the County of San Francisco ("State Court") to the United States District Court for the Northern District of California ("District Court") pursuant to 28 U.S.C. §§ 1331, 1367, 1441, and 1446. Defendant's removal of this matter is based on the grounds set forth below:

## I. BACKGROUND INFORMATION

On June 10, 2026, Plaintiffs Aidan Aarons and Sean Pollard, individually and on behalf of all others similarly situated ("Plaintiffs"), initiated an action against NextRoll in the Superior Court of California for the County of San Francisco, captioned *Aidan Aarons, et al. v. NextRoll, Inc.*, Case Number CGC-26-637769 (the "State Court Action"). A true and correct copy of the Complaint filed in the State Court Action is attached as **Exhibit A** to the Declaration of Matthew E. Lewitz ("Lewitz Decl.") filed concurrently herewith.

In their putative class action Complaint, Plaintiffs allege that they visited one or more websites that utilized NextRoll's "tracking technology." (Compl. ¶ 73.) Plaintiffs allege they were not aware of and did not consent to the operation of NextRoll's "tracking technologies" while using these websites. (*Id.* ¶¶ 74-75.) Plaintiffs further allege that NextRoll collected their personal information while Plaintiffs used these websites and "intercepted" their communications without Plaintiffs' consent. (*Id.* ¶¶ 74-75, 78.)

On these allegations, Plaintiffs assert a cause of action for violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511 (the "ECPA"). (Compl. ¶¶ 123-142.) In support of their ECPA claim, Plaintiffs allege that they "did not authorize [NextRoll] to acquire the content of their communications for purposes of" allegedly invading their privacy and that they "had a reasonable expectation that [NextRoll] would not intercept their communications for its own commercial benefit and for the benefit of third-parties without their knowledge or consent." (Compl. ¶ 140.) Plaintiffs allege that "[b]y utilizing the AdRoll Pixel and other tracking technologies, as described herein, [NextRoll] intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class Members in violation of 18 U.S.C. § 2511(1)(a)." (*Id.* ¶ 134.) Plaintiffs also allege that NextRoll violated the ECPA by "intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic

communications, while knowing or having reason to know that the information was obtained through" the improper interception of an electronic communication. (*Id.* ¶ 136.)

In addition to an ECPA claim, Plaintiffs also assert the following causes of action on behalf of themselves and the putative class: (1) violation of Cal. Penal Code § 631; (2) violation of Cal. Penal Code § 638.51; (3) violation of Cal. Penal Code § 632; (4) violation of Cal. Penal Code § 502; (5) Invasion of Privacy in Violation of Art. 1, § 1 of the California Constitution; (6) violation of Cal. Bus. & Prof. Code § 17200 (the "UCL"); and (7) Common Law Invasion of Privacy. (Compl. ¶¶ 86-122, 143-177.) Like Plaintiffs' violation of the ECPA claim, Plaintiffs' other claims stem from allegations that NextRoll intercepted and used the contents of Plaintiffs' communications and personal information without their consent. (*See, e.g.*, Compl. ¶ 92 (alleging that "Plaintiffs and Class Members did not consent to Defendant intercepting, reading, or using their communications"); ¶ 101 (alleging that Nextroll's recording of Plaintiffs' "IP addresses and other routing, addressing, and signaling information, without a court order or user consent, violates Cal. Penal Code § 638.51"); ¶ 113 ("Upon information and belief, Defendant utilized Plaintiffs' and Class Members' sensitive personal information . . . for Defendant[']s own commercial purposes.").)

On July 20, 2026, NextRoll was served with a copy of the Summons and Complaint in the State Court Action. (Lewitz Decl., ¶ 4.)

## II. <u>BASIS FOR REMOVAL — FEDERAL QUESTION JURISDICTION</u>

Pursuant to 28 U.S.C. § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Here, this Court has original jurisdiction over the State Court Action pursuant to 28 U.S.C. § 1331 because it arises from an alleged violation of the ECPA. (Compl. ¶¶ 123-142.)

Further, "in any civil action of which the district courts have original

jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

Here, Plaintiffs' state and common law claims arise from the same alleged common nucleus of operative fact as Plaintiffs' ECPA claim. (*Compare* Compl. ¶¶ 123-142, *with* Compl. ¶¶ 86-122, 143, 177.) Thus, this Court has supplemental jurisdiction over Plaintiffs' state and common law claims pursuant to 28 U.S.C. § 1367(a). *See, e.g.*, *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1083 (N.D. Cal. 2025) (court had federal question jurisdiction over ECPA claim and supplemental jurisdiction over state and common law claims for invasion of privacy, intrusion upon seclusion, and violation of the CIPA); *Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732, 738 (N.D. Cal. 2023) ("The Court has jurisdiction over Plaintiff's Wiretap Act claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(a)").

Accordingly, because this Court has original jurisdiction over Plaintiffs' ECPA claim and supplemental jurisdiction over Plaintiffs' state and common law claims, this action may be removed to this Court pursuant to 28 U.S.C. § 1441(a).

## III. NEXTROLL HAS COMPLIED WITH ALL PREREQUISITES FOR REMOVAL

### A. Proper Venue

This Court is the appropriate venue for removal under 28 U.S.C. § 1441(a). The State Court Action was pending before the Superior Court for the County of San Francisco. This Court is the district and division embracing the place where the State Court Action is pending. 28 U.S.C. § 1441(a).

### B. Timely Filed Notice

Plaintiff served NextRoll with the Summons and Complaint for the State Court Action on July 20, 2026. (Lewitz Decl. ¶ 4.) As this Notice of Removal is filed

within 30 days of service of the Complaint on NextRoll, it is timely under 28 U.S.C. § 1446(b).

**C. <u>Unserved Defendants Need Not Join the Notice of Removal</u>**

Pursuant to 28 U.S.C. § 1446(b)(2)(A), when a civil action is removed solely under § 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action. Here, NextRoll is the only named defendant. (Lewitz Decl., Ex. A.) Accordingly, NextRoll is not required to obtain consent from any other defendants before removing the State Court Action.

**D. <u>Copy of State Court File</u>**

Pursuant to 28 U.S.C. § 1446(a) and Local Rule requirements, NextRoll has attached a copy of all process, pleadings, and orders in the State Court Action as **Exhibits A-B** to the accompanying Declaration of Matthew E. Lewitz.

**E. <u>Copies of Notice of Removal</u>**

NextRoll is serving a copy of this Notice of Removal on all adverse parties and filing a copy with the clerk of the State Court pursuant to 28 U.S.C. § 1446(d). A copy of the notice to all adverse parties and the State Court is attached (without exhibits) as **Exhibit C** to the Declaration of Matthew E. Lewitz.

**F. <u>Reservation of Rights</u>**

By removing this action, NextRoll does not waive and expressly reserves all defenses, objections and motions, Rule 12 defenses, and any challenges to class certification.

**IV. <u>CONCLUSION</u>**

For the foregoing reasons, NextRoll respectfully requests that this Court (a) assume full jurisdiction over this action under 28 U.S.C. §§ 1331, 1367, 1441, and 1446; (b) proceed with this action as properly removed; and (c) grant such other and further relief as the Court deems just and proper.

Dated: August 19, 2026

COZEN O'CONNOR

By: */s/ Matthew E. Lewitz*

Brett N. Taylor
Matthew E. Lewitz
Madeline J. Suchard
Attorneys for Defendant NextRoll, Inc.

**PROOF OF SERVICE**

**STATE OF CALIFORNIA,**

**COUNTY OF LOS ANGELES**

I am employed in the aforesaid county, State of California; I am over the age of 18 years and not a party to the within action; my business address is 401 Wilshire Boulevard, Suite 850, Santa Monica, California 90401; nbator@cozen.com.

On August 19, 2026, I served the following document:

**NOTICE TO STATE COURT AND ADVERSE PARTIES OF REMOVAL TO FEDERAL COURT AND OF STAY OF STATE COURT PROCEEDINGS**

on the interested parties in this action by placing the true copy thereof, enclosed in a sealed envelope addressed as follows:

| | |
|---|---|
| Matthew W. Ruan (SBN 264409)<br>Nicholas R. Lange (*Pro Hac Vice* Forthcoming)<br>Justice Jagher London & Millen LLC<br>100 Tri-State International, Suite 128<br>Lincolnshire, IL 60069 | *Attorney for Plaintiffs Aidan Aarons and Sean Pollard*<br>Tel.: 224-632-4500;<br>E-mail: mruan@jjlmlaw.com<br>nlange@jjmlaw.com |

☒ **(BY FIRST CLASS MAIL)**

☐ I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

☒ I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at Santa Monica, California, in the ordinary course of such business.

☒ **(BY ELECTRONIC TRANSMISSION)**
Pursuant to CCP § 1010.6, I served the documents in this case by means of electronic service only directly to the persons at the e-mail address(es) listed based on notice provided by the parties.

☒ **(STATE)** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on August 19, 2026, at Santa Monica, California.

Nancy Bator

**Nancy Bator**